UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

INTERNATIONAL BUSINESS MACHINES
CORPORATION,

                Plaintiff,

    – against –

UNITED MICROELECTRONICS
CORPORATION,

                Defendant.

_____

Civ. No. 16-cv-5270

COMPLAINT

## <u>COMPLAINT</u>

Plaintiff International Business Machines Corporation ("IBM"), by its undersigned attorneys Chaffetz Lindsey LLP, for its Complaint against Defendant United Microelectronics Corporation ("UMC"), states as follows:

## <u>JURISDICTION, VENUE AND GOVERNING LAW</u>

1. This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) because there is complete diversity of citizenship between the parties who are, respectively, citizens of New York and the Republic of China (Taiwan), and because the amount in controversy exceeds $75,000.00.

2. Effective June 13, 2013, the parties entered into a First Amended and Restated Technology Licensing Agreement (the "2013 Restated TLA"), which is the contract at issue in this case. This Court has personal jurisdiction over Defendant UMC because UMC expressly agreed to submit to the personal jurisdiction of this Court pursuant to § 12.8 of the 2013 Restated TLA.

3.   Venue is appropriate in this forum pursuant to 28 U.S.C. § 1391(c)(3) and also because Defendant UMC expressly consented to the venue by agreeing pursuant to § 12.8 of the 2013 Restated TLA which requires that all disputes relating to the 2013 Restated TLA shall be "commenced exclusively in the U.S. District Court of the Southern District of New York."

4.   Section 12.8 of the 2013 Restated TLA provides that the agreement "shall be construed and the legal relations between the Parties shall be determined in accordance with the laws of the State of New York without regard to the conflict of law provisions thereof."

## NATURE OF THE ACTION

5.   In this breach of contract action IBM sues to recover the $10 million license fee plus interest due under the parties' 2013 Restated TLA.  Pursuant to that agreement, IBM granted UMC a non-exclusive license to use IBM's proprietary semiconductor technology and know-how in the People's Republic of China (the "PRC"), in exchange for a payment of $10 million. Payment was due no later than December 15, 2015, but UMC has refused to pay.  IBM, having fully complied with certain pre-litigation dispute resolution procedures required under the contract, now brings this action for breach of contract.

## THE PARTIES

6.   IBM is a global technology company organized under the laws of the State of New York, with its principal place of business in Armonk, New York.  At the time of contracting with UMC, IBM was a leader in the microelectronics industry, specifically with regard to the complex and costly development of semiconductor technology.  IBM has since sold the manufacturing portion of its microelectronics business and no longer owns the technology that it licensed to

UMC under the 2012 and 2013 technology licensing agreements at issue in this case.  IBM, however, retained the contractual rights and obligations at issue in this case.

7.  UMC is a global semiconductor producer, or "foundry," organized under the laws of Taiwan, with its principal place of business in Taiwan.

**FACTS**

A. IBM Licensed Semiconductor Technology Rights to UMC Under a 2012 Technology Licensing Agreement

8.  Semiconductors are small, complex devices that are an essential component of most integrated circuits, such as microprocessors.  Semiconductor technology evolves rapidly, with each new development phase referred to as a new "generation" or "node."  Developing semiconductor technology is extremely challenging and expensive.  Prior to the sale of its semiconductor manufacturing business, IBM was one of very few companies that had the skill and resources to develop the most advanced semiconductor technology.  UMC did not have such skills or resources.

9.  In or around 2011, UMC approached IBM to explore the possibility of licensing portions of IBM's semiconductor technology.   In 2012, IBM and UMC entered into a Technology Licensing Agreement, effective June 29, 2012 (the "2012 TLA").  Pursuant to the 2012 TLA, IBM granted UMC a non-exclusive license to use specified portions of IBM's semiconductor technology (the "Licensed Technology") in manufacturing facilities located in four geographic regions—the United States, Japan, Singapore and Taiwan.

10. Pursuant to § 4.1 of the 2012 TLA, as consideration for the rights granted under that agreement, UMC paid IBM $45 million.  In § 4.1 of the 2013 Restated TLA, the parties acknowledged that UMC had made that prior payment in a timely manner.

B. In 2013, IBM Agreed to Extend UMC's Rights Under the 2012 TLA to the PRC in Exchange for an Additional Payment of $10 million

11. In 2013, UMC informed IBM that it intended to expand its business in the PRC and wanted to be a leader in the PRC semiconductor market.  UMC planned to establish a subsidiary and semiconductor manufacturing facility in the PRC where it would use the latest available semiconductor technology.  UMC wanted to utilize the Licensed Technology in the PRC and also wanted the ability to use newer generations of IBM semiconductor technology still under development.

12. Accordingly, IBM and UMC negotiated and executed a comprehensive arrangement that included several contracts relating to UMC's access to and use of various generations of IBM semiconductor technology in the PRC.  One such contract was the 2013 Restated TLA.  At UMC's request, the 2013 Restated TLA expanded the scope of the license IBM had previously granted to UMC under the 2012 TLA to include rights to use the Licensed Technology in the PRC:

> Whereas, [UMC] has requested an expansion of its rights with respect to the technology, including the right to sublicense to a Majority Owned Subsidiary with manufacturing facilities in the PRC, and IBM is willing to grant such expansion on the terms stated in this Amended and Restated Agreement; . . .
>
> Trade Secret/Know-How License.  IBM hereby grants to [UMC], under IBM's trade secret/know-how rights in the Licensed Technology, a non-exclusive worldwide, fully paid (for the Named Facility upon completion of payments due under Section 4.1A) . . . license to use . . . the Licensed Technology. . . .

(2013 Restated TLA at p. 3 & § 3.1.).

13. The payment terms of the 2013 Restated TLA were clear and unambiguous.  As consideration for IBM's expansion of the 2012 licensing rights, UMC would pay IBM $10 million (the "Amendment Payment"):

> <u>Amendment Payment</u>.  As consideration for the licenses and other rights
> granted for the Named Facility [UMC] shall pay to IBM a total
> nonrefundable payment of Ten Million Dollars ($10,000,000) payable
> anytime between January 1, 2015 and December 15, 2015 inclusive (the
> "Amendment Payment").

(*Id.* § 4.1A.)

14. At UMC's request, IBM allowed UMC to make the Amendment Payment at any time between January 1, 2015 and December 15, 2015.  The Agreement provided, however, that if UMC did not make the payment by December 15, 2015, it would be liable to pay interest at 12% *per annum* for every day on which payment was overdue:  "[UMC shall] be liable for interest on any overdue payment otherwise due under this Agreement, which interest shall be calculated commencing on the date such payment became due, using an annual rate of twelve percent (12%)."  (*Id.* § 4.2.)

C.  <u>UMC Did Not Make the Amendment Payment, Breaching the 2013 Restated TLA</u>

15. UMC has never made the Amendment Payment. Toward the end of 2015, IBM contacted UMC seeking the Amendment Payment.  At that time, a representative of UMC expressed to IBM for the first time that UMC believed the 2013 Restated TLA created only an option for UMC to license the technology in the PRC, that UMC would not be exercising its option, and that UMC would not pay the Amendment Payment.  Shortly thereafter, UMC further advised IBM that it could not obtain the required government regulatory approvals to perform the contract in the PRC and that therefore, in its view, it had no obligation to make the Amendment Payment.

16. At all relevant times, IBM disagreed with UMC's stated bases for not paying and maintained that the 2013 Restated TLA created a binding obligation on UMC and that UMC was not excused from performance.

D.  The Parties Negotiated Under the 2013 Restated TLA's Dispute Resolution Provision

17. The 2013 Restated TLA contains a dispute resolution clause at § 12.20 that requires, in the event of a dispute arising under the contract, that the parties participate in three periods of good-faith negotiations, each lasting a period of 30 days.  That provision further requires that the parties designate an increasingly senior representative to conduct the negotiation contemplated at each phase.

18. If the parties are not able to resolve the dispute after the full 90-day negotiation period, either party may deliver a final settlement offer to the other party along with a notice of an intention to terminate negotiations in five business days.  If no settlement is reached upon the expiration of the five business day notice period, either party may then initiate litigation.

19. On January 13, 2016, the parties convened the first of the three good-faith negotiation sessions.  The parties continued their negotiations after January 13, 2016, through phone calls, emails, and two additional meetings taking place on February 22, 2016 and on March 28, 2016. However, the parties were not able to resolve their dispute and the 90-day period expired on April 12, 2016.

20. On April 29, 2016, IBM presented UMC with its final settlement offer and notice of its intent to terminate negotiations within five business days, or by no later than May 6, 2016. UMC did not accept IBM's offer by May 6, 2016.  In accordance with § 12.20, IBM initiated this litigation.

## COUNT I

## BREACH OF CONTRACT

21. IBM repeats and incorporates by reference the allegations set forth in paragraphs 1 to 20 above as though fully set forth herein.

22. The 2013 Restated TLA is unambiguous and creates binding and enforceable contractual obligations.

23. IBM fulfilled its obligations under the 2013 Restated TLA by, among other things, irrevocably granting UMC the right to use the Licensed Technology in the PRC effective upon payment of the Amendment Payment.

24. UMC has breached the contract by failing to comply with its contractual obligation to pay IBM the $10 million Amendment Payment.

25. The 2013 Restated TLA is not subject to any interpretation that would make UMC's payment optional or that would excuse UMC's performance with the contract's payment obligations.

26. IBM has been damaged by UMC's breach of the 2013 Restated TLA in an amount equal to $10 million plus interest accruing at an annual rate of 12% from December 15, 2015.

## PRAYER FOR RELIEF

WHEREFORE, IBM respectfully requests that this Court enter judgment against UMC and in favor of IBM as follows:

(1) Awarding IBM damages of no less than $10 million, plus pre-judgment interest at a rate of 12% *per annum* and post-judgment interest at the statutory rate;

(2) Granting IBM such other further relief as the Court deems just and proper.

Dated:    New York, NY
          July 1, 2016

                                              Respectfully submitted:

                                              **CHAFFETZ LINDSEY LLP**

                                              By:    /s/ Peter Chaffetz
                                                     Peter Chaffetz
                                                     Jennifer L. Permesly
                                                     Stephanie Sado
                                                     1700 Broadway, 33rd Floor
                                                     New York, New York 10019
                                                     Tel. (212) 257-6960
                                                     Fax. (212) 257-6950

                                                     *Attorneys for Plaintiff International*
                                                     *Business Machines Corporation*