UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------

INTERNATIONAL BUSINESS
MACHINES CORP., : 16cv5270

      Plaintiff, : <u>OPINION & ORDER</u>

-against- :

UNITED MICROELECTRONICS CORP., :

      Defendant. :

------------------------------

WILLIAM H. PAULEY III, United States District Judge:

      International Business Machines Corporation ("IBM") brings this breach of contract action against United Microelectronics Corporation ("UMC") seeking approximately $10 million in damages. UMC moves to dismiss IBM's Complaint for failure to plead a condition precedent under Rule 9(c). IBM moves separately for summary judgment. For the reasons that follow, UMC's motion to dismiss is denied, and IBM's motion for summary judgment is granted.

BACKGROUND

      The gravamen of IBM's Complaint is that UMC failed to make a $10 million "amendment" payment in breach of a 2013 Technology Licensing Agreement (the "2013 Agreement").

I.   <u>The 2013 Agreement</u>

      The 2013 Agreement amends a previous licensing agreement between the parties in which IBM granted UMC a technology license to manufacture silicon wafers (the "Technology License") at facilities located in the United States, Japan, Singapore, and Taiwan. In June 2013, following UMC's request to expand the geographic scope of the Technology

License to the People's Republic of China ("China"), the parties entered into the 2013 Agreement.

  A. <u>Majority Owned Subsidiary and Named Facility</u>

Under the 2013 Agreement, the Technology License may only be sub-licensed to what the agreement defines as a Majority Owned Subsidiary—a company in which UMC maintains at least a 60% interest and a Chinese government agency owns the remaining 40%. (Reply Declaration of Salvatore P. Tamburo, ECF No. 49, Ex. A (the "2013 Agreement"), § 1.19.) The 2013 Agreement further provides that the silicon wafers must be manufactured at a Named Facility—a wafer semiconductor fabrication facility located in China owned and controlled by the Majority Owned Subsidiary—that UMC must identify to IBM. (2013 Agreement, § 1.19B.)

  B. <u>Parties' Obligations</u>

Under the 2013 Agreement, IBM agreed to amend the parties' previous licensing agreement and granted a non-exclusive, perpetual, and irrevocable Technology License for use in China. (2013 Agreement, § 3.) Use of such license, however, was conditioned on performance by UMC. The 2013 Agreement sets forth UMC's obligations in the following terms:

> Anytime between January 1, 2015 and December 31, 2015 inclusive, [UMC] will pay IBM the fee set forth in Section 4.1A and simultaneously therewith provide notice to IBM of the name of the sole Majority Owned Subsidiary and the name and location of the sole Named Facility. Upon receipt of such payment and notice by IBM, [UMC] will have the rights associated with such Majority Owned Subsidiary and Named Facility granted under this Agreement.

(2013 Agreement, § 2A; <u>see also</u> § 4.1A.)

The $10 million payment represented "consideration for the licenses and other rights granted for the Named Facility," and could be paid anytime between January 1, 2015 and December 15, 2015.[1]  (2013 Agreement, § 4.1A.)

    C. Alleged Breach

In June 2013, the parties executed the 2013 Agreement.  However, IBM alleges that UMC paid nothing for the Technology License during the relevant period.  (Compl., ¶ 15.)  As the payment deadline prescribed in the 2013 Agreement drew near, IBM contacted UMC seeking payment.  UMC responded that it had no obligation to pay.  It further advised IBM that "it could not obtain the required government regulatory approvals to perform the contract in [China] and that therefore, in its view, it had no obligation to make" payment.  (Compl., ¶ 15.)  In July 2016, after the parties engaged in contractually mandated pre-suit negotiations that failed to resolve the dispute, IBM filed this action.  (Compl., ¶¶ 17–20.)

## DISCUSSION

I. UMC's Motion to Dismiss

    A. Standard

In reviewing a motion to dismiss a breach of contract claim pursuant to Rule 12(b)(6), this Court accepts as true the non-conclusory factual allegations in the Complaint and draws all reasonable inferences in IBM's favor.  See Roth v. Jennings, 489 F.3d 499, 501 (2d Cir. 2007).  The Complaint must contain enough "factual content" to allow a court "to draw the

---

[1] The 2013 Agreement sets forth two different final payment deadlines.  Section 2A sets the period for payment between January 1, 2015 and December 31, 2015 while Section 4.1A requires payment at any time between January 1, 2015 and December 15, 2015.  IBM acknowledges the discrepancy between the two provisions but notes that the deadline is "relevant only to the calculation of interest," and has no bearing on its "case for summary judgment on liability or the principal amount of its claim."  (Plaintiff's Memo. of Law in Opposition to Motion to Dismiss and Cross-Motion for Summary Judgment ("IBM MTD Opp. and SJ Mot."), ECF No. 39, at 6 n.2.)  Based on IBM's decision to accept December 31, 2015 as the operative payment deadline, any interest should be calculated as accruing from that date.

reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Further, where a contract is integral to the complaint, a court may consider that document when assessing the merits of the motion to dismiss. See, e.g., Interpharm, Inc. v. Wells Fargo Bank, 655 F.3d 136, 141 (2d Cir. 2011).

"When interpreting disputed contract terms, a court should give effect to the intent of the parties as revealed by the language and structure of the contract, and should ascertain such intent by examining the document as a whole." Am. Tax Funding, LLC v. City of Syracuse, 41 F. Supp. 3d 188, 196–97 (N.D.N.Y 2014) (citing Peak Dev., LLC v. Constr. Exch., 100 A.D.3d 1394, 1395 (App. Div. 4th Dep't 2012)); Campbell v. Mark Hotel Sponsor, LLC, 2010 WL 3466020, at *4 (S.D.N.Y. Sept. 3, 2010). The language of a contract should be interpreted so as to promote the "general or primary purpose" of the overall agreement. Peak Dev., 100 A.D.3d at 1395. Moreover, courts "need not turn a blind eye to context. Rather, [ ] [they] should accord contractual language its plain meaning giving due consideration to the surrounding circumstances and apparent purpose which the parties sought to accomplish." In re Coudert Bros., 487 B.R. 375, 389 (S.D.N.Y. 2013) (alterations omitted).

The threshold question in resolving disputed contractual terms is whether they are ambiguous. Ambiguity "is a question of law for the Court to decide on a claim-by-claim basis." Oppenheimer & Co., Inc. v. Trans Energy, Inc., 946 F. Supp. 2d 343, 348 (S.D.N.Y. 2013) (internal citations omitted). A contract is considered unambiguous if it has "a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." Olin Corp. v. Am. Home Assur. Co., 704 F.3d 89, 99 (2d Cir. 2012) (internal citations omitted).

If the terms are "susceptible to more than one reasonable interpretation," the contract is ambiguous. Evans v. Famous Music Corp., 1 N.Y.3d 452, 458 (2004). But the "mere assertion of an ambiguity does not suffice to make an issue of fact." Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan, 7 F.3d 1091, 1095 (2d Cir. 1993). Nor does it exist if the "interpretation urged by one party would strain [ ] the contract language beyond its reasonable and ordinary meaning." Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp., 595 F.3d 458, 467 (2d Cir. 2010) (internal citation omitted). Rather, ambiguity exists only when the terms are "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." Revson v. Cinque & Cinque, P.C., 221 F.3d 59, 66 (2d Cir. 2000) (internal quotation marks and citation omitted). A court's "task is to determine whether such clauses are ambiguous when read in the context of the entire agreement." Sayers, 7 F.3d at 1095.

Importantly, an "interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible. Rather, an interpretation that gives a reasonable and effective meaning to all terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect." Galli v. Metz, 973 F.2d 145, 149 (2d Cir. 1992) (internal citations and quotation marks omitted); Columbus Park Corp. v. Dep't of Hous. Pres. & Dev., 80 N.Y.2d 19, 31 (N.Y. 1992) ("[A] construction which makes a contract provision meaningless is contrary to basic principles of contract interpretation."). Thus, when interpreting a contract, a court "must consider <u>the entire contract</u> and choose the interpretation of [the disputed provision] which best accords with the sense of the remainder of the contract." Galli, 973 F.2d at 149 (emphasis added).

B. <u>Analysis</u>

The central basis for UMC's motion to dismiss is that the Complaint fails to allege the existence and satisfaction of a condition precedent. UMC contends that the language of Section 2A—namely, that UMC "will pay IBM the fee set forth in Section 4.1A and simultaneously therewith provide notice to IBM of the name of the sole Majority Owned Subsidiary and the name and location of the sole Named Facility"—implicitly creates a condition precedent that those entities exist. Without those entities, UMC argues there is nothing to provide notice of, and therefore its performance is excused. (UMC Memo. of Law in Support of Motion to Dismiss ("UMC MTD"), ECF No. 35, at 6–7.)

IBM counters that UMC has an unconditional obligation to pay $10 million irrespective of whether notice is provided. According to IBM, any suggestion that Section 2A creates a joint obligation to pay and provide notice is belied by other provisions of the contract which outline an unconditional duty to pay.

Under New York law, a condition precedent is "an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises." <u>Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.</u>, 86 N.Y.2d 685, 690 (N.Y. 1995) (internal quotation marks omitted). "Conditions can be express or implied. Express conditions are those agreed to and imposed by the parties themselves. Implied or constructive conditions are those imposed by law to do justice." <u>Oppenheimer</u>, 86 N.Y.2d at 690 (internal citation and quotation marks omitted). The "law does not favor a construction which creates a condition precedent." <u>General Elec. Capital Corp. v. D'Agostino Supermarkets, Inc.</u>, 2005 WL 1683531, at *2 (S.D.N.Y. July 18, 2005) (citing <u>Penn Intermodal Leasing, Inc. v. Shipping Corp. of India</u>, 1997 WL 431087, at *6 (S.D.N.Y. July 30, 1997)). Because of that,

"[c]onditions precedent are not readily assumed," and must "be expressed in unmistakable language." Bank of N.Y. Mellon Trust Co., N.A. v. Morgan Stanley Mortg. Capital, Inc., 821 F.3d 297, 305 (2d Cir. 2016) (citing Oppenheimer, 86 N.Y.2d at 691)). Thus, a "condition precedent will not be imposed unless the contract reveals it was the clear intent of the parties." Gen. Elec., 2005 WL 1683531, at *2.

The 2013 Agreement contains neither the "specific, talismanic words" nor the "unmistakable language" that ordinarily give rise to an express or implied condition precedent. Oppenheimer, 86 N.Y.2d at 691. UMC argues that the first sentence of Section 2A creates a simultaneous obligation to pay and give notice, and that it cannot give notice if the Majority Owned Subsidiary and Named Facility do not exist. But the notion that this clause creates a condition precedent by implication is belied by the existence of express conditions elsewhere in the contract. For starters, the sentence immediately following the "simultaneously herewith" language in Section 2A is worded in expressly conditional terms: "Upon receipt of such payment and notice by IBM, [UMC] will have the rights associated with such Majority Owned Subsidiary and Named Facility granted under this Agreement." (2013 Agreement, § 2A (emphasis added).) Other sections of the 2013 Agreement also create conditions precedent in unmistakable language. (See, e.g., 2013 Agreement, § 3.1 ("IBM hereby grants to [UMC], under IBM's trade secret/know-how rights in the Licensed Technology, a non-exclusive worldwide, fully-paid (for the Named Facility, upon completion of payments due under Section 4.1A) . . . license.") (emphasis added); see also §§ 3.2–3.3.) These provisions evidence the parties' intent to insert conditions in certain sections of the 2013 Agreement while omitting them from others. If the parties wished to condition both UMC's payment and notice obligations on the existence of a

Majority Owned Subsidiary and Named Facility, they would have done so in equally explicit terms.

UMC's argument that "the obligation at issue is the simultaneous notice and payment" is also flawed. (UMC Reply Brief in Support of Motion to Dismiss and Opposition to Summary Judgment ("UMC Reply and SJ Opp."), ECF No. 43, at 3.) Section 2A states that payment and notice should be given "simultaneously" at any time between January 2015 and December 2015, but that does not mean the former cannot be performed without the latter. UMC's simultaneous obligation argument flounders when Section 2A is read together with the other provisions of the 2013 Agreement, all of which provide for scenarios in which payment and notice occur separately.

As an initial matter, Section 4.1A provides that "[a]s consideration for the licenses and other rights granted for the Named Facility [UMC] shall pay to IBM a total nonrefundable payment of Ten Million Dollars ($10,000,000)." Nothing in this section mandates that notice must be provided at the same time payment is tendered. Rather, Section 4.1A's use of the word "shall" unequivocally mandates payment. Dallio v. Spitzer, 343 F.3d 553, 562 (2d Cir. 2003) (" 'Shall' is universally understood to indicate an imperative or mandate.").

Moreover, at least three other clauses in the 2013 Agreement reveal the parties' intent to make payment unconditional without the need for notice to occur at the same time. Section 5.3, for example, permits a party to cure any breach except the failure to pay. If either party is:

> [I]n material breach of any obligation, other than payments under 4.1A, 4.2, and/or 4.3, and the other Party ("Non-Breaching Party") provides written notice to the Breaching Party specifying the nature of such breach, the Breaching Party shall either cure such breach or produce a plan for such cure acceptable to the Non-Breaching Party within thirty (30) Days after such written notice.

(2013 Agreement, § 5.3 (emphasis added).) Notably, the cure provision not only permits an opportunity to cure, but affords the breaching party the flexibility to propose a plan for cure. The parties contemplated that most breaches—including the failure to provide notice—could be cured. If, for whatever reason, UMC could not find a Majority Owned Subsidiary and Named Facility by the end of December 2015, it could always invoke Section 5.3 and propose a plan for cure, buying itself more time to provide notice. By contrast, failure to pay $10 million after the prescribed period could neither be excused nor cured.

Similarly, Sections 9 and 12 afford a breaching party relief under certain circumstances except with respect to payment. Section 9 provides that UMC's "cumulative liability to IBM for direct damages under [the 2013 Agreement] . . . shall be limited to Two Million Dollars ($2,000,000)" except "for breach by [UMC] of . . . liabilities relating to payments under Sections 4.1, 4.3, or 4.4." (2013 Agreement, § 4.) And Section 12.5's force majeure clause excuses performance if an event renders a party "wholly or partially unable . . . to carry out its obligations" except the "payment obligations under Section 4." (2013 Agreement, § 12.5.) As in Section 5.3, the parties contemplated and excused performance if certain external events—like "restraints by or actions of any governmental body"—precluded a party from performing its obligations. (2013 Agreement, § 12.5.) But the clear delineation between the duty to pay and all other duties underscores the parties' intent that payment would occur without condition and, if necessary, separately from the performance of other obligations, including notice.

The common thread among these provisions—each of which account for the various circumstances where performance may be excused—is that they exclude from application the duty to pay. By singling out UMC's duty to pay as the only thing over which

9

their terms have no bearing, these provisions amplify the parties' intent to make that obligation unconditional. Importantly, that UMC could be relieved of every contractual obligation except the duty to pay undermines the notion that payment had to occur with notice.

UMC's efforts to fuse payment with notice as inseparable obligations and its insistence that they are subject to a condition precedent essentially converts the notice provision into a condition precedent to the obligation to pay. That is, notice triggers payment, but not the other way around. And while the ability to give notice is contingent on what UMC claims is a necessary event—the existence of a Majority Owned Subsidiary and a Named Facility—the duty to pay is not subject to any such externalities. Thus, what UMC says is a condition precedent "necessary to [its] ability to perform the obligation at issue" is really only a "triggering event" to its duty to provide notice. Bank of N.Y., 821 F.3d at 307. Adopting UMC's interpretation of the contract would result in an incongruous reading of the contract that would render many of its provisions surplusage. For instance, both Section 12.5, which excuses performance as to notice but not payment, and Section 5.3, which allows a cure period for failure to provide notice but not payment, "would appear to serve no purpose." Int'l Multifoods Corp. v. Comm. Union Ins. Co., 309 F.3d 76, 86 (2d Cir. 2002).

The reasonable interpretation of the 2013 Agreement is that UMC had from January 2015 to December 2015 to find a Majority Owned Subsidiary and Named Facility to use the Technology License in China. If UMC found these entities within the relevant period, it was required to simultaneously provide notice and make payment to IBM. If UMC failed to timely notify IBM of a Majority Owned Subsidiary and Named Facility, the contract provided a number of options through which UMC could comply after December 2015. But this also means that the parties contemplated the possibility that notice and payment would not occur simultaneously.

10

While Section 5.3, for example, could relieve UMC from its duty to provide notice before the end of December 2015, it expressly foreclosed that option for UMC's duty to pay. The inevitable outcome resulting from these clauses is that payment <u>had</u> to occur between January 2015 and December 2015 while notice <u>could</u> occur within that period or after. "This interpretation gives meaning to both [Section 2A] and preserves the meaning of the other provisions of the [2013 Agreement]. It most closely follows the intention of the parties as discerned from a review of the agreement as a whole." <u>Hamilton v. Dep't of Labor</u>, 2008 WL 2605128, at *7 (S.D.N.Y. July 1, 2008).

Because no condition precedent exists, UMC's motion to dismiss is denied.

II. <u>Motion for Summary Judgment</u>

    A. <u>Standard</u>

Under Rule 56, summary judgment is proper where "there is no genuine issue as to any material fact and [ ] the moving party is entitled to judgment as a matter of law." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). Where "it is clear that the defendant cannot defeat the motion by showing facts sufficient to require a trial for resolution, summary judgment may be granted notwithstanding the absence of discovery." <u>Wells Fargo Bank Nw., N.A. v. Taca Int'l Airlines, S.A.</u>, 247 F. Supp. 2d 352, 360 (S.D.N.Y. 2002). In a breach of contract action, the "proper interpretation of an unambiguous contract is a question of law for the court, and a dispute on such an issue may properly be resolved by summary judgment." <u>Omni Quartz v. CVS Corp.</u>, 287 F.3d 61, 64 (2d Cir. 2002); <u>Consarc Corp. v. Marine Midland Bank, N.A.</u>, 996 F.2d 568, 573 (2d Cir. 1993) ("If a contract is unambiguous, courts are required to give effect to the contract as written and may not consider the extrinsic evidence to alter or interpret its meaning.").

B. <u>Analysis</u>

IBM contends that it is entitled to summary judgment because there is no genuine dispute of material fact. That position is premised on IBM's view that the 2013 Agreement is unambiguous and does not require extrinsic evidence to aid this Court in resolving disputed issues of fact. In response, UMC levels a number of objections, citing not one, but two conditions precedent that excuse payment. The first condition precedent—that the Majority Owned Subsidiary and Named Facility must exist—has already been discussed at length. The second condition, which UMC raises for the first time in response to IBM's motion, is that it must have the "ability to use IBM's technology in [China]." (UMC Reply to Motion to Dismiss and Opposition to Summary Judgment ("UMC MTD Reply and SJ Opp."), ECF No., at 11.)

As previously discussed, Section 2A is not ambiguous and does not impliedly create a condition precedent. While the parties offer competing interpretations of that clause,[2] where "consideration of the contract as a whole [ ] remove[s] [any] ambiguity created by a particular clause, there is no ambiguity." <u>W.W.W. Assocs., Inc. v. Giancontieri</u>, 77 N.Y.2d 157, 162–63 (1990) (any ambiguity of disputed provision resolved by consideration of contract in its entirety and recognition of the contrasting provisions adopted by parties). Here, the 2013 Agreement mandates that the duty to pay and provide notice are two separate and independent obligations.

---

[2] UMC offers a raft of extrinsic evidence, including two internal IBM emails from 2014 to support its position that IBM acknowledged "UMC's payment would not be due unless the Majority Owned Subsidiary and Named Facility existed." (UMC MTD Reply and SJ Opp., at 14–15 (citing Reply Decl. of Salvatore Tamburo, Exs. K and N).) But consideration of extrinsic evidence is only proper if the contract is ambiguous. Even if this Court concluded that Section 2A is ambiguous, extrinsic evidence that UMC offers in support of its argument that IBM purportedly was aware that "payment [was] linked to the existence of the subsidiary and facility" post-dates the 2013 Agreement. (UMC MTD Reply and SJ Opp., at 14–15.) Fundamental principles of contract law dictate that the parties' intentions must be determined at the time the contract was made. <u>Granite Computer Leasing Corp. v. Travelers Indem. Corp.</u>, 1987 WL 8647, at *3 (S.D.N.Y. Mar. 23, 1987) (citing <u>Greenwich Vill. Assocs. v. Salle</u>, 493 N.Y.S.2d 461, 463 (App. Div. 1st Dep't 1985)). Thus, even on summary judgment, the extrinsic evidence would not resolve a genuine dispute concerning the existence of a condition precedent.

UMC's argument that the 2013 Agreement contains a second condition precedent—that it must have the ability to use the Technology License in China before it pays—is without merit. As with the first condition, nothing in the 2013 Agreement unmistakably states that UMC's duty to pay was conditioned on its ability to use the Technology License. But aside from the absence of such language, UMC overlooks IBM's performance—it granted a perpetual, irrevocable license that UMC was free to use so long as it paid and and provided notice. Despite its then-inability to use the Technology License, UMC received it knowing that it would not expire and that it could not be revoked. UMC got what it bargained for.

In any event, as UMC concedes, it knew during negotiations of the 2013 Agreement that there were "technical and regulatory obstacles" to using the Licensed Technology in China. (UMC MTD Reply and SJ Opp., at 19.) And it was aware that "Taiwanese regulations restricted transfers to [China] of technology that was two generations older than what was used in Taiwan." (UMC MTD Reply and SJ Opp., at 19.) Given these concerns, and the probable limitations regarding use of the Technology License, there is even more reason to believe that UMC could have expressly conditioned payment on its ability to use the license if it wanted to.

Having found that Section 2A is not ambiguous, this Court turns to IBM's motion for summary judgment. To establish a claim for breach of contract under New York law, a plaintiff must demonstrate: "(1) the existence of an agreement, (2) adequate performance of the contract by the claimant, (3) breach of contract by the accused, and (4) damages." <u>Stadt v. Fox News Network LLC</u>, 719 F. Supp. 2d 312, 318 (S.D.N.Y. 2010) (internal quotation marks and alterations omitted). Here, there is no dispute that the 2013 Agreement exists—it amended the terms of a previous agreement that the parties entered into in 2012. IBM performed its duties

13

under the contract when it "grant[ed] to [UMC] . . . a non-exclusive worldwide, fully-paid (for the Named facility, upon completion of payments due under Section 4.1A) royalty-free, perpetual and irrevocable . . . license to use." (2013 Agreement, §§ 3.1–3.3.) UMC had an obligation to pay and to provide notice, neither of which were performed during the prescribed time period. And because there is no condition precedent to UMC's duty to pay, UMC is not excused from performance.

The only issue that remains is damages. "When the court determines that a contract has been breached, the non-breaching party is entitled to recover damages that arise naturally from the breach or that were reasonably foreseeable at the time the contract was made." Umbach v. Carrington Inv. Partners (US), LP, 851 F.3d 147, 162 (2d Cir. 2017) (internal citation and quotation marks omitted). The "goal is to place the injured party in the same place as he would have been if the contract had been performed because the standard remedy for breach of contract is based upon the reasonable expectations of the parties ex ante. This principle of expectation damages is measured by the amount of money that would put the promisee in the same position as if the promisor had performed the contract." Umbach, 851 F.3d at 162 (internal citations and alterations omitted). Expectation damages are appropriate here. Had UMC performed its obligation to pay at some point between January 2015 and December 2015, IBM would have received $10 million.

Ancillary to the type of damages at issue is whether the amount of damages arising from UMC's breach should be the full contract price of $10 million or limited to $2 million. UMC urges the latter, citing Section 9.3, which limits damages to $2 million dollars except with regard to "liabilities relating to payments under Sections 4.1, 4.3 or 4.4." (2013 Agreement, § 9.3.) But Section 9.3 makes no reference to Section 4.1A. UMC seizes on this

14

omission to argue that damages arising from a breach of Section 4.1A should be limited to $2 million. It raises a fair point that the parties "showed they considered sections 4.1 and 4.1A to be two separate sections with their own identity and meaning and that they knew how to specifically recite section 4.1A, where intended." (UMC MTD Reply and SJ Opp., at 22.) However, Section 4.1 has no application to the 2013 Agreement since it pertains to a $45 million payment for the original license granted under a previous agreement and was tendered long before the parties entered into the 2013 Agreement.

Courts have "long insisted that contracts may not be interpreted in [a] manner [ ] so as to frustrate and distort the intentions of the parties." Mailer v. RKO Teleradio Pictures, Inc., 332 F.2d 747, 749 (2d Cir. 1964). Read in its entirety, the contract identifies a singular obligation—the duty to pay—that cannot be excused by a force majeure event, or cured from breach, or constrained by preconditions. Simply put, the parties intended to make the $10 million payment an unconditional, independent obligation. To limit liability to $2 million for breach of that provision simply because, for whatever reason, the parties failed to insert Section 4.1A in place of an obsolete, unrelated payment clause would result in "a woodenly technical parsing of language to create a meaning wholly at variance from that which the parties plainly intended." Mailer, 332 F.2d at 749.

Indeed, there is no conceivable scenario under which the carve-out clause in Section 9.3 could have any meaning or application to Section 4.1 because it is impossible to breach a provision that has already been fully performed. A fairer reading of Section 9.3 is that it does not limit damages arising from a breach of the obligation to make the $10 million payment required by Section 4.1A. This interpretation gives meaning to all provisions in the contract, renders Section 9.3 consistent with other sections, and harmonizes the intent of the

15

parties.  Reape v. New York News, 122 A.D.2d 29, 30 (App. Div. 2d Dep't 1986) ("[T]he actual words [of the contract] may be transplanted, supplied or entirely rejected to clarify the meaning of the contract.").

Accordingly, UMC is liable for breach of Sections 2A and 4.1A, and is directed to pay damages in the amount of $10 million with accrued interest as of December 31, 2015.

## CONCLUSION

For the foregoing reasons, UMC's motion to dismiss is denied, and IBM's motion for summary judgment on its breach of contract claim is granted.  IBM is awarded $10 million with interest from December 31, 2015.  The parties are directed to submit a proposed judgment to this Court by September 12, 2017.  The Clerk of Court is directed to terminate the motions pending at ECF Nos. 33 and 38, and mark this case as closed.

Dated:  September 7, 2017
       New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.